# 25-_____

# United States Court of Appeals
# for the Second Circuit

---

SJUNDE AP-FONDEN, individually and on behalf of all others similarly situated,

*Plaintiffs-Respondents,*

v.

THE GOLDMAN SACHS GROUP, INC., LLOYD C. BLANKFEIN, AND GARY D. COHN

*Defendants-Petitioners.*

---

On Petition for Review of an Order of the United States District Court for the Southern District of New York, Case No. 18-cv-12084 (VSB)

---

## DEFENDANTS' PETITION FOR PERMISSION TO APPEAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(f)

---

JOHN M. GILDERSLEEVE
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
  50th Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100
john.gildersleeve@mto.com

DONALD B. VERRILLI, JR.
ELAINE J. GOLDENBERG
DANIEL J. KANE
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
  Suite 500E
Washington, DC 20001
Telephone: (202) 220-1100
donald.verrilli@mto.com

*Counsel for Defendant-Petitioner The Goldman Sachs Group, Inc.*
September 18, 2025

(Additional Counsel Listed on Inside Cover)

Andrew J. Ehrlich
Kristina Bunting
Daniel S. Sinnreich
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

*Counsel for Defendant-Petitioner
Lloyd C. Blankfein*

Scott A. Edelman
MILBANK LLP
55 Hudson Yards
New York, NY 10001
(212) 530-5000

*Counsel for Defendant-Petitioner
Gary D. Cohn*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Petitioner The Goldman Sachs Group, Inc. ("Goldman") states that it is a corporation organized under the laws of Delaware, and its shares are publicly traded on the New York Stock Exchange. Goldman has no parent corporation, and to the best of Goldman's knowledge, no publicly held company owns 10 percent or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT.............................................i

INTRODUCTION ................................................................... 1

BACKGROUND ...................................................................... 5

QUESTION PRESENTED ...................................................... 10

ARGUMENT ......................................................................... 11

I.  This Court Should Clarify That The Principles In *Goldman* And *ATRS* Apply Where A Case Involves Alleged Misstatements And Alleged Corrective Disclosure At The Same Level Of Specificity ............................................... 11

    A.  The District Court Erred In Assessing The Alleged Corrective Disclosure ................................................. 11

    B.  The District Court Erred In Assessing The Intervening Disclosures.................................................................... 17

    C.  The District Court Erred In Assessing Other Significant Evidence ...................................................... 22

II.  The Decision Below Warrants Immediate Appellate Review ....... 27

CONCLUSION ...................................................................... 30

CERTIFICATE OF COMPLIANCE ......................................... 31

CERTIFICATE OF SERVICE.................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

*ATRS v. Goldman Sachs,*
  77 F.4th 74 (2d Cir. 2023) .............................................................. *passim*

*Goldman Sachs v. ATRS,*
  594 U.S. 113 (2021) ............................................................. 1, 2, 11, 24

*Halliburton v. Erica P. John Fund,*
  573 U.S. 258 (2014) ...................................................................... 25

*Hevesi v. Citigroup,*
  366 F.3d 70 (2d Cir. 2004) ........................................................ 11, 28

*In re Kirkland,*
  2024 WL 1342800 (S.D.N.Y.) ........................................................ 28

*Morrison v. Nat'l Austl. Bank,*
  561 U.S. 247 (2010) ...................................................................... 29

*In re NIO,*
  2023 WL 5048615 (E.D.N.Y.) .................................................... 28, 29

*Ottaviani v. State Univ.,*
  875 F.2d 365 (2d Cir. 1989) .......................................................... 27

*San Diego Cnty. Emps. v. J&J,*
  2025 WL 2176586 (3d Cir.) ............................................................ 28

*In re Vivendi,*
  838 F.3d 223 (2d Cir. 2016) .......................................................... 16

*Waggoner v. Barclays,*
  875 F.3d 79 (2d Cir. 2017) ............................................................ 16

Oral Argument, *In re Kirkland*, No. 24-1030
  (2d Cir. Sept. 9, 2024), https://ww3.ca2.uscourts.gov/
  decisions/isysquery/c4c65e41-2e9d-4b27-85c9-
  2111ce3b0b5e/1/doc/24-1030%20mtn.mp3 .......................................... 28

## INTRODUCTION

This is a textbook case for Rule 23(f) review. Plaintiffs brought a securities-fraud class action against Goldman on an "inflation-maintenance" theory. Under that theory, plaintiffs identify a drop in a company's stock price that roughly coincides with negative publicity. Plaintiffs then reason backwards, arguing that the drop should be viewed as a proxy for the inflationary effect (or "price impact") of some earlier misstatement. But before a district court certifies a class, defendants can show that the alleged misstatement did not affect the stock price.

The Supreme Court and this Court recently laid down important principles that demand a rigorous analysis at the class-certification stage to determine whether price impact exists. *See Goldman Sachs v. ATRS*, 594 U.S. 113 (2021); *ATRS v. Goldman Sachs*, 77 F.4th 74, 99 (2d Cir. 2023). Those decisions establish that there is no price impact absent a "tight fit" between "the contents of [a] misrepresentation and [a] corrective disclosure" "as written," such that the corrective disclosure "directly render[s]" false the earlier misstatement. 77 F.4th at 89, 97-100. A "mismatch" in contents "break[s] down" the inference of any such impact. *Id.* Moreover, courts must conduct a searching review and

1

consider "*all* probative evidence" relating to price impact, "qualitative as well as quantitative," "aided by a good dose of common sense." *Id.* at 122.

The district court thought that those principles do not apply with the same force, or at all, outside the particular factual context that *Goldman* and *ATRS* addressed: one where "the earlier misrepresentation is generic" and "the later corrective disclosure is specific." *Goldman*, 594 U.S. at 123. The court acknowledged that the alleged misstatements here—that Goldman lacked evidence of the involvement of a Malaysian businessman named Jho Low in "1MDB" bond transactions, and that Goldman's CEO was unaware of red flags relating to those transactions beforehand—do not precisely match the alleged corrective disclosure, and that the disclosure did not directly render the latter of the alleged misstatements false. A-0016-0017.[1]

In fact, there is no tight fit here between the alleged misstatements and the alleged corrective disclosure—and so the district court could find a match only by doing exactly what this Court has said courts should not do. Given that the alleged misstatements in this case are not "generic" like those in *ATRS*, the district court thought it had the latitude to

---

[1] "A" cites are to this petition's appendix.

rewrite the alleged misstatements and alleged corrective disclosure, treating them as if they said something more general than they did and embellishing them with inferences and imagined details. For instance, the court *assumed* from an alleged corrective disclosure about a 2013 meeting involving Goldman's CEO, the Malaysian Prime Minister, Low, and about 20 Goldman clients that Low's mere presence in the room during any mention of 1MDB meant that Goldman must have known about Low's involvement in the earlier 1MDB transactions—even though no indication exists that anything that happened there would have given rise to such knowledge. And the court somehow read the same alleged corrective disclosure about the client meeting as correcting the CEO's statement that he was not aware of red flags concerning the 1MDB transactions beforehand, even though the relevant article expressly stated that the CEO may not have been aware of any such flags.

Next, the court discounted *prior* disclosures that had already contradicted the alleged misstatements with *no effect* on Goldman's stock price—which alone establishes the absence of price impact. For example, although the court concluded that prior to the alleged corrective disclosure there was no information in the market that Goldman had

3

evidence of Low's involvement in the 1MDB transactions, in fact the market learned a week earlier that a high-ranking Goldman executive, in charge of business in Southeast Asia, had *pleaded guilty* to conspiring with Low on the 1MDB scheme. Given that information, the alleged corrective disclosure could not have revealed for the first time that Goldman had evidence of Low's involvement.

Finally, ignoring the Supreme Court's directive to consider all probative evidence, the district court disregarded Goldman's evidence— including that at the relevant time *no* market analyst discussed the alleged misstatements or connected them to the alleged corrective disclosure. *ATRS* deemed a similar absence of analyst commentary highly probative. Yet the district court refused to consider those facts, concluding that "no 'searching' analysis" is necessary here because there was no "gap in front-end-back-end genericness." A-0023-0024.

Any of those errors justifies granting this petition. Together they illustrate what *ATRS* recognized: the Court still has "work to do" in inflation-maintenance cases, which are "[n]ot easy stuff." 77 F.4th at 105; *see id.* at 107-09 (Sullivan, J., concurring) (calling for simplification of the analysis). The Court has not revisited the doctrine since *ATRS*, leaving

4

district courts with scant guidance—particularly where front-end statements and back-end disclosures are each specific rather than generic. And the district court's confusion here about the "new and uncharted territory" *ATRS* opened, *id.* at 95, which is also reflected in decisions by other district courts and appellate courts (pp.28-29, *infra*), makes obvious the pressing need for this Court to step in. After all, loosening the standard for class certification, as the district court did, is extraordinarily consequential: "inflation-maintenance" class actions are easy to gin up with hindsight, billions of dollars are often at stake, certification puts almost unbearable pressure on defendants, and undue imposition of liability harms businesses and investors.

## BACKGROUND

A. From May 2012 to March 2013, Goldman underwrote bond offerings for a sovereign fund known as "1MDB." A-0002. As it turned out, Goldman employees Tim Leissner (Goldman's Southeast Asia chairman) and Roger Ng had conspired with Malaysian businessman Jho Low to divert 1MDB funds. A-0002-0003. Leissner and Ng were criminally convicted, and Goldman accepted responsibility for its role, including by paying billions in fines. A-0003; A-0037.

5

In December 2018, Plaintiffs brought a securities-fraud class action seeking billions in damages. Plaintiffs alleged that Defendants made false and misleading statements about 1MDB and that Goldman's stock price dropped after the "truth" was revealed on November 8 and 9, 2018. A-0274-0303.

Two statements (the "alleged misstatements") are relevant. First, on December 22, 2016, a Goldman spokesperson stated that "[w]e have found no evidence showing any involvement by Jho Low in the 1MDB bond transactions" (the "Low-Involvement Statement"). A-0004. Second, on November 1, 2018, an interviewer asked Lloyd Blankfein—Goldman's CEO from 2006 to 2018—whether "[t]here were reports, though, that senior management there [sic] were red flags on this beforehand. Fair?" A-0002-0004. Blankfein responded, "I'm not aware of them, but I'm not in a position to refute facts that I don't have a complete picture of and haven't been presented" (the "Red-Flags Statement"). *Id.* No analyst reports or earnings calls mentioned either statement, A-0504-0512; A-0754-0788, and neither caused Goldman's stock price to increase, A-0010.

According to Plaintiffs, those statements were revealed to be false by two news reports about a post-1MDB meeting in 2013 (together, the "alleged corrective disclosure"):

- On November 8, 2018, at 11:17 p.m., the *Financial Times* reported that "[p]rosecutors believe that Mr[.] Low met on a second occasion with a senior Goldman executive in 2013 at a gathering that included the Malaysian PM," and that "[a] person briefed on the matter said that the unnamed executive … was Mr[.] Blankfein, although there is some doubt over whether Mr[.] Low was at that second meeting."  A-0042; A-0449.

- On November 9, 2018, at 11:02 a.m., *The Wall Street Journal* added, in an article Plaintiffs claim was "confirmatory," that "Mr. Blankfein met Mr. Low for a second time" at a 2013 meeting arranged by Leissner "with around 20 high-level Goldman clients."  A-0455; A-0814.  The article noted that Low attended with the Malaysian Prime Minister; that prior reports had described a 2009 Blankfein-Low meeting; and that the meetings included discussions about 1MDB.  A-0454-

0455.  The article also noted that one meeting came "after [Goldman's] compliance department" had raised "concerns about" Low, but that there was "no indication" that Blankfein "was aware of the bank's compliance concerns about Mr. Low at the time."  A-0454.[2]

No contemporaneous analyst reports connected the alleged corrective disclosure to the alleged misstatements, A-0087-0088, and Goldman's stock price did not experience a statistically significant decline until over five hours into the trading day on November 9, when a rash of other information was circulating in the market, A-0529-0539.

The absence of any market reaction to the alleged corrective disclosure was unsurprising, as the alleged misstatements had *already* been contradicted by numerous public disclosures (the "intervening disclosures"), none of which caused Goldman's stock price to decline.  A-0499-0504; A-1198.  Notably, filings in the criminal case against Leissner disclosed both the "overarching criminal scheme" he conspired in with Low on the 1MDB transactions and Low's meetings "with a high-ranking

---

[2] Subsequent reporting on November 9 stated that "Low did not attend" the 2013 meeting.  A-0493; *see* A-0374-0375.

executive of Goldman" in 2009 and 2013. A-1026-1031; A-1040-1041; A-1064. Earlier articles reported that Blankfein attended a 2009 meeting with the Malaysian Prime Minister at which Low was present and 1MDB was discussed. *E.g.*, A-0443-0444. And a best-selling book (*Billion Dollar Whale*) explained that Goldman had overlooked red flags about Low. A-0107.

B. After a magistrate judge recommended certifying a class based on the alleged misstatements, A-0036-0093, the district court adopted the recommendation, A-0001-0035. Emphasizing that the alleged misstatements in this case were not generic like the ones in *ATRS*, the court concluded that the alleged corrective disclosure here sufficiently "matched" the two statements at issue. A-0011-0018. For instance, while disclaiming any rewriting, the court said that the Red-Flags Statement would "have been understood as a disavowal" of 1MDB "involvement" and that the corrective disclosure was "an important development in the larger story of Goldman denying institutional culpability." A-0015-0018.

Although *Goldman* required the district court to review *all* probative evidence, the court rejected much of Defendants' evidence showing that the intervening disclosures had contradicted the alleged

9

misstatements and that market analysts gave the misstatements no weight. It did so on the ground that "no 'searching' analysis" was necessary because this case, unlike *ATRS*, did not involve a "gap in front-end-back-end genericness." A-0023-0024. The court also concluded that the November 9 and November 12 stock-price drops supported a price-impact inference despite the significant delay before the drops occurred. A-0025-0034.

## QUESTION PRESENTED

Whether, in considering class certification in a securities case in which plaintiffs allege "inflation maintenance," the district court erred by failing to conduct the requisite searching price-impact analysis on the mistaken understanding that the precedents requiring that analysis do not apply with full force to cases not involving mismatches in "front-end-back-end genericness."

10

## ARGUMENT

**I. This Court Should Clarify That The Principles In *Goldman* And *ATRS* Apply Where A Case Involves Alleged Misstatements And Alleged Corrective Disclosure At The Same Level Of Specificity**

Rule 23(f) review is appropriate on *any* ground this Court deems sufficient, including if (1) "the certification order will effectively terminate the litigation and there has been a substantial showing that the district court's decision is questionable," or (2) "the certification order implicates a legal question about which there is a compelling need for immediate resolution." *Hevesi v. Citigroup*, 366 F.3d 70, 76 & n.4 (2d Cir. 2004). There are more than sufficient grounds here. The district court made multiple errors traceable to a fundamental misconception about the requirements in *Goldman* and *ATRS*, any one of which warrants this Court's immediate intervention. Given those errors' cumulative effect and the enormous stakes, there is an overwhelming need for this Court to clarify that the same basic rules must be rigorously applied in all inflation-maintenance cases.

### A. The District Court Erred In Assessing The Alleged Corrective Disclosure

The alleged corrective disclosure here does not "actually correct[]" the alleged misstatements. *Goldman*, 594 U.S. at 123. The district court

11

acknowledged the absence of an express or precise match, and even acknowledged that the Red-Flags Statement was not directly rendered false by the corrective disclosure. A-0015. The court was therefore obliged to follow *ATRS*'s holding that courts cannot manufacture a "tight fit" by "reimagining" the relevant statements. 77 F.4th at 97-100. The court did the opposite: it "concoct[ed]" a match, *id.* at 100-01, rewriting the statements and reasoning that a match is likely where, as here, a case does not involve an *ATRS*-type gap in genericness. A-0010-0018.

1.    a.    ***Low-Involvement Statement***.    The alleged corrective disclosure does not directly render false Goldman's statement that "[w]e have found no evidence showing any involvement by Jho Low in the 1MDB bond transactions." A-0004. The corrective disclosure states that, after the 1MDB transactions concluded, Blankfein hosted a 2013 client event for the Malaysian Prime Minister and 20 clients, purportedly including Low, where 1MDB was discussed. A-0014. But the mere fact that Blankfein and Low might have been at the same client event when 1MDB was touched upon says *nothing* about Goldman's knowledge of *Low's* involvement in the transactions themselves.

To try to overcome that problem, the district court impermissibly rewrote and reimagined the statements and disclosure. First, the court made a series of naked suppositions about what Goldman must have known based on the 2013 event. A-0014. But the disclosure offers none of the details the court conjured up about the content of or participants in any discussion of 1MDB at that large gathering with a head of state. A-0454-0455. And the court's assertion that Blankfein would have had no reason to go to that event absent knowledge that Low was involved in the 1MDB transactions, A-0014, is simply made up—the disclosure says no such thing.

Second, the court reimagined the disclosure as addressing *Goldman's* knowledge of Low's involvement, notwithstanding that it discusses only Blankfein personally. The court relied on "agency law," A-0011, but offered no basis for holding that *investors* would have understood Blankfein's attendance in 2013 as correcting the statement that Goldman had no evidence of Low's involvement.

b. ***Red-Flags Statement***. The court similarly erred as to the Red-Flags Statement. As written, that statement says at most that Blankfein was unaware "beforehand" of red flags concerning the 1MDB

13

transactions.  A-0420.  And the later corrective disclosure does not state or imply that Blankfein himself was aware of red flags.  To the contrary, the November 9, 2018 article states that "[t]here is no indication Mr. Blankfein was aware of the bank's compliance concerns about Mr. Low at the time."  A-0454.  No reasonable investor could conclude from that material that the disclosure directly contradicts the Red-Flags Statement.

That is no doubt why the district court *acknowledged* that the corrective disclosure did not "directly render the [Red-Flags Statement] false."  A-0016.  Under this Court's precedent, that should have ended the analysis.

Instead, the district court resorted to impermissible generalizations and abstractions.  The court concluded that investors would have *understood* the Red-Flags Statement "as a disavowal of involvement in the 1MDB transaction," given Blankfein's *separate* statement that "one of our people lied to us and evaded our systems" and what the court thought was a "larger story of Goldman denying institutional culpability."  A-0016-0017; A-0420-0421.

14

But that is pure supposition—which runs contrary to evidence about investors' disinterest (pp.23-27, *infra*)—about how investors would have understood statements that do not contradict each other. Allowing a supposition of that kind is a recipe for limitless liability. It is *always* possible to ratchet a misstatement or disclosure up to a higher level of generality until a match can be plausibly claimed. That is exactly why *ATRS* rejected efforts to "identify and extract a generic truth purportedly embodied" in a "highly specific corrective disclosure" to "craft a link" with the alleged misrepresentation. 77 F.4th at 99. The district court erred in not heeding *ATRS* on that score.

Moreover, the district court selectively focused on only certain "context[ual]" information to create a match. A-0016-0017. As noted, the court looked to a separate statement Blankfein made in the same interview that produced the Red-Flags Statement. *Id.* But, even if doing so was allowed, the court ignored contextual material relating to the corrective disclosure—e.g., material in the November 2018 articles stating that there was no indication Blankfein was aware of 1MDB red flags. A-0454-0455. The court's cherry-picking of "context" skewed the inquiry.

15

2.   The district court made those mistakes because it drew an erroneous conclusion from the fact that *ATRS* involved generic misstatements and this case does not.

The court attempted to locate this case on the "spectrum" of this Court's precedent, A-0013, consisting of *Waggoner v. Barclays*, 875 F.3d 79, 87 (2d Cir. 2017), *In re Vivendi*, 838 F.3d 223, 235-37 (2d Cir. 2016), and *ATRS*, and concluded that Plaintiffs had identified a "strong" match because this case is distinct from *ATRS* and its "genericness gap," A-0010-0018.  But although *ATRS* explained that generic misstatements are *unlikely* to support an inference of price impact, it does not follow that specific misstatements are *likely* to support an inference of price impact. The district court rightly recognized that any attenuated connection between the alleged misstatements and corrective disclosure here is worlds away from *Waggoner*, where the corrective disclosure "implicated" the "alleged misstatements themselves," and is not equivalent to *Vivendi*, where the disclosure "*expressly* implicat[ed]" or obviously contradicted the alleged misstatements, *ATRS*, 77 F.4th at 97-98.  Simply concluding, however, that this case is closer to *Vivendi* than to *ATRS* is irreconcilable with the analysis demanded by this Court's precedent.

16

This Court therefore needs to make clear that the "match" analysis is as rigorous in a case like this one as it is in a case involving a "genericness gap." Either way, a tight fit between the statements "as written" is required, or there is no match. And if, as here, a court has to labor to find a match by rewriting the statements and disclosure, generalizing them into an overarching "narrative," or drawing debatable inferences from them, the fit is not tight enough.

## B. The District Court Erred In Assessing The Intervening Disclosures

The district court profoundly erred in its assessment of the powerful evidence of intervening disclosures (i.e., truthful substitutes) *predating* the alleged corrective disclosure. Those intervening disclosures negated the alleged misstatements as written—with no effect on the stock price. When an intervening disclosure shows an alleged misrepresentation to be untrue with no corresponding stock-price impact, that fact dispositively establishes that the alleged misstatement was not propping up the price in the first place. *ATRS*, 77 F.4th at 103; *see id.* at 105-06 (Sullivan, J., concurring). Yet once again, the district court failed to engage in the required analysis, apparently believing that *Goldman* and *ATRS* are not fully applicable in a case like this one. Having required

17

only a loose fit between the alleged misstatements and corrective disclosure, the court inexplicably demanded a near-perfect fit between the alleged misstatements and the intervening disclosures as written.

1. a. ***Low-Involvement Statement.*** Goldman introduced a slew of intervening disclosures from credible sources revealing that Goldman knew of Low's involvement in 1MDB—all without a decline in Goldman's stock price. A-0499-0501; A-1198. For instance, filings in Leissner's criminal prosecution that were unsealed *a week before* the alleged corrective disclosure revealed that Leissner admitted to conspiring with Low in connection with the 1MDB transactions and that Low "met with a high-ranking [Goldman] executive" in 2009 and 2013. A-1040, A-1064. A separate article identified Blankfein as the executive at the 2009 meeting. A-0443. Other articles and *Billion Dollar Whale* cited widespread awareness within Goldman of Low's involvement, including a Goldman-wide discussion addressing Low's role setting up a 1MDB meeting and multiple Goldman risk-related committees that discussed "the role of" Low, whom an executive described as a 1MDB "[o]perator or intermediary." A-0440; A-0500-0501; A-0733-0742; A-1072-1073.

Accordingly, when the alleged corrective disclosure was made, the market *already had* information contradicting the Low-Involvement Statement. Even if the alleged corrective disclosure added "details and severity," *ATRS*, 77 F.4th at 99, the alleged misstatements could not have been propping up the stock price on November 9, 2018.

The district court nevertheless erroneously concluded that none of the intervening disclosures contradicted the Low-Involvement Statement. The court recognized that those intervening disclosures showed "widespread awareness of Goldman employees' knowledge of Low's involvement," yet instead demanded that the intervening disclosures match Plaintiffs' generalized "theory" that "Goldman denied institutional complicity" and "blamed … rogue employees." A-0019-0022. That is blatant rewriting—which is no more permissible in the intervening-disclosure context than it is in the corrective-disclosure context.

In any event, the intervening disclosures far more closely matched the alleged misstatements than the alleged corrective disclosure did— and the district court never said otherwise. For example, Leissner's guilty plea to conspiring with Low on the 1MDB transactions is direct

19

evidence of Goldman's knowledge of Low's involvement—and, at minimum, is far more direct evidence than the corrective disclosure about Blankfein's attendance at a 2013 client meeting with Low. In addition, the intervening disclosures' revelation of a *2009* meeting that Blankfein and Low attended at which 1MDB was discussed contradicts the Low-Involvement Statement just as much as the alleged corrective disclosure regarding a 2013 meeting on the same topic. The court's refusal to acknowledge as much is miles from the necessary rigorous analysis.

b. ***Red-Flags Statement***. The intervening disclosures equally contradict the alleged misstatement that Blankfein did not know of red flags as to the 1MDB transactions. A-0022-0023. For instance, *Billion Dollar Whale* described how Goldman "overlooked" "red flags," including "the involvement of Jho Low." A-1077. And an article stated that Blankfein and more than 30 Goldman executives had reviewed the 1MDB deal and that "[r]ival bankers" said the deal fees should have raised red flags. A-1068-1069. Again, then, before the alleged corrective disclosure the market *already had been told* information that contradicted Plaintiffs' interpretation of the Red-Flags Statement.

The district court's failure to accept that conclusion is deeply flawed. The court had nothing to say about most of Goldman's evidence, including *Billion Dollar Whale*'s reference to Goldman overlooking "red flags" like Low's "involvement." A-1077. Instead, the court limited its assessment to a single article about Goldman executives' review of the 1MDB deal and rival bankers' red-flags statements. A-1068-1069. In just a few terse lines, the court read the article to say that the deal "should" have raised red flags rather than that it "in fact did" so, and concluded that the bankers' statements were unreliable. A-0022-0023. But that reliability assessment has no grounding, and the court's parsing of "should" versus "did"—which requires much closer matching than the court demanded in its analysis of the alleged corrective disclosure—does not track what a reasonable investor would actually have understood.

In addition, the intervening disclosures say at least as much about Blankfein's knowledge of red flags as the alleged corrective disclosure does. Indeed, the intervening disclosures say far *more* on that topic, and certainly are a better match to the Red-Flags Statement than the alleged corrective disclosure about a 2013 client meeting held *after* the last of the

21

1MDB transactions, especially because the November 9, 2018 article states that Blankfein may *not* have been aware of red flags. A-0454.

2. As to both alleged misstatements, the district court's plaintiffs-always-win analysis of the on-point intervening disclosures is not what *Goldman* and *ATRS* require. The court unjustifiably strained to create a match between the alleged misstatements and alleged corrective disclosure and to reject a match between the same misstatements and other, intervening disclosures. That approach drains the force from *Goldman* and *ATRS* and threatens to make class certification in inflation-maintenance cases routine.[3]

## C. The District Court Erred In Assessing Other Significant Evidence

The district court's confusion over how and whether to apply the principles laid down in *Goldman* and *ATRS* is especially apparent in its analysis of Goldman's other evidence conclusively rebutting price impact. That evidence shows that market analysts assigned no significance to the

---

[3] The case for interlocutory review is even stronger because the district court incorporated the magistrate's analysis, which focused on *hypothetical* "truthful substitute[s]" for alleged misstatements. A-0067-0072; A-0024. There is no justification for imagining hypothetical substitutes when a defendant introduces *actual* intervening disclosures.

alleged misstatements and that Goldman's stock price did not drop in reaction to the alleged corrective disclosure. Yet the district court strikingly asserted that *no* "searching price impact analysis" is required here, and that it need not consider the market-commentary evidence *at all*, because of factual differences between this case and *ATRS*. That is wrong, and this Court should make clear that *Goldman* and *ATRS* are fully applicable in *every* inflation-maintenance case.

1. The district court's categorical rejection of Goldman's strong market-commentary evidence cannot be justified.

As this Court has explained, "pre- or post-disclosure" market "discussion" about a "front-end misstatement can be a useful indicator of its inflation-maintaining capacity." *ATRS*, 77 F.4th at 102-03. Accordingly, in concluding in *ATRS* that Goldman had "sever[ed] the link between back-end price drop and front-end misrepresentation," this Court placed serious weight on evidence that *none* of "880 analyst reports" referenced a purported misstatement regarding conflicts of interest, even though some reports "touch[ed] on" that "subject." *Id.* at 104-05.

23

Here, Goldman introduced equally powerful evidence that investors did not rely on the alleged misstatements. Not one of 811 pre-disclosure analyst reports discussed them. They were not mentioned on any earnings call. And not a single post-disclosure analyst report connected the alleged corrective disclosure to the alleged misstatements. A-0504-0512; A-0754-0788; A-0087-0088.

Yet, confused about the reach of *ATRS*, the court closed its eyes to that evidence. The court concluded that, because the alleged misstatements and corrective disclosure are on the same level of specificity, "no 'searching' analysis of evidence such as market commentary [is] required"—period. A-0023-0024. According to the court, *ATRS* requires such analysis only where "there is a considerable gap in front-end-back-end genericness." A-0023.

But *Goldman* and *ATRS* stand for no such thing. *Goldman* squarely held that courts "assessing price impact at class certification" must "be open to *all* probative evidence on that question." *Goldman*, 594 U.S. at 122. And *ATRS* does not quixotically try to override *Goldman*'s instruction; rather, *ATRS* explains that where, as here, there is reason

24

to doubt price impact, a court should conduct an *especially* probing "analysis."  77 F.4th at 102, 105.

To the extent the district court assumed that some analysis was needed, its two-sentence discussion is woefully insufficient.  The court concluded only that the evidence was "not sufficient" to rebut price impact given the "relative strength of the match between the front-end misstatements and the corrective disclosure, *as compared to ATRS*, as well as the [magistrate's] analysis of the truthful-substitute test."  A-0024 (emphasis added).  That is hardly "searching review" of a record showing that investors paid no attention to the alleged misstatements.  *ATRS*, 77 F.4th at 100, 105; *see* pp.11-17, 22 n.3, *supra*.

2.    The district court went similarly astray in rejecting incontrovertible evidence that Goldman's stock price experienced *no* statistically significant decline in any reasonable proximity to the alleged corrective disclosure.

Defendants may rebut the presumption of reliance by introducing "evidence that the asserted misrepresentation (or its correction) did not affect" the stock's "market price."  *Halliburton v. Erica P. John Fund*, 573 U.S. 258, 279-80 (2014).  And if a correction yields "stock price movement"

25

that is not "statistically significant," the movement "cannot be attributed to company-specific information announced on the event date." *ATRS*, 77 F.4th at 86 n.5.

The parties here agree that Goldman's stock trades in a highly efficient market. Accordingly, the stock price "should react immediately, within seconds, if not minutes," to material developments. A-1221. But Goldman's stock did not experience a statistically significant decline until almost six hours into the November 9 trading day. The price then dropped again on the next trading day (November 12), *four days* after the first disclosure.

The district court seemed to recognize that the long delay, especially as to November 12, showed that the alleged corrective disclosure had no effect, A-0034—but the court refused to follow the evidence to its logical conclusion. The court thought it significant that Goldman's stock price declined close-to-close between November 8 and November 9, A-0025, but the efficient market here would have reacted much faster. The court also relied on the decline in the stock price early on November 9, even though that decline was not statistically significant at the "gold standard" 95% confidence level. A-0025. But "[w]hen the

26

results of a statistical analysis yield levels of statistical significance at or below the 0.05 level, chance explanations for a disparity become suspect." *Ottaviani v. State Univ.*, 875 F.2d 365, 371 (2d Cir. 1989); *see ATRS*, 77 F.4th at 86 n.5. And as even the district court recognized, the larger decline on November 12 cannot readily be attributed to four-day-old news. A-0009-0034. Plaintiffs *themselves* originally attributed that decline to separate Malaysia-related news, only to reverse course when the court deemed that news non-actionable. A-0131.

The evidence that the alleged corrective disclosure—and, by extension, any earlier misstatements—did not affect the stock price dooms Plaintiffs' class-certification motion, just as the rest of the evidence does. The district court concluded otherwise only because it once again did not meaningfully apply the lessons of *Goldman* and *ATRS*—thereby certifying a class where just a modicum of common sense indicates that the alleged misstatements did not maintain price inflation.

## II. The Decision Below Warrants Immediate Appellate Review

The decision below cries out for Rule 23(f) review. First, the decision "will effectively terminate the litigation and there has been a substantial showing that the district court's decision is questionable."

*Hevesi*, 366 F.3d at 76.  Orders certifying securities-litigation classes are "likely to escape effective review" after final judgment because few such actions are "litigated to conclusion."  *Id.* at 80.  And, as discussed, the certification decision is highly questionable in multiple ways.

Second, there is a truly "compelling need" for "immediate resolution" of the question presented here.  366 F.3d at 76.  The Court recognized in *ATRS* that it still "ha[s] work to do," 77 F.4th at 105, and guidance on how *ATRS* applies when the alleged misstatements and corrective disclosure are at the same level of specificity is badly needed. *See* Oral Argument 7:00-7:36, 14:50-15:14, *In re Kirkland*, No. 24-1030 (2d Cir. Sept. 9, 2024), https://ww3.ca2.uscourts.gov/decisions/isysquery/ c4c65e41-2e9d-4b27-85c9-2111ce3b0b5e/1/doc/24-1030%20mtn.mp3 (panel acknowledging need to clarify "basic legal framework").

Indeed, courts in this circuit are regularly confronting that issue, as are other circuits.  *See, e.g.*, *In re NIO*, 2023 WL 5048615, at *14-15 (E.D.N.Y.); *In re Kirkland*, 2024 WL 1342800, at *11-12 (S.D.N.Y.); *see also, e.g.*, *San Diego Cnty. Emps. v. J&J*, 2025 WL 2176586, at *3-4 & n.6 (3d Cir.).  In *NIO*, for example, there was a significant mismatch between an alleged misstatement ("construction has started") and an alleged

corrective disclosure (termination of the project).  2023 WL 5048615, at *14-15.  As here, the court in *NIO* wrote off *Goldman* as addressing only disparities in genericness, reasoning that "[a]lthough the corrective disclosure is not a perfect match," the specificity of the statements made matching "easier." *Id.* at *14-15.

As "the Mother Court of securities law," *Morrison v. Nat'l Austl. Bank*, 561 U.S. 247, 276 (2010) (Stevens, J., concurring), this Court should make clear that such reasoning is incorrect.  It is vital to ensure that clear rules govern class-certification decisions and that defendants will not face the threat of extraordinarily onerous liability in virtually every inflation-maintenance case.

## CONCLUSION

The petition should be granted.

DATED: September 18, 2025     MUNGER, TOLLES & OLSON LLP

By: */s/ Donald B. Verrilli, Jr.*

JOHN M. GILDERSLEEVE                    DONALD B. VERRILLI, JR.
MUNGER, TOLLES & OLSON LLP    ELAINE J. GOLDENBERG
350 South Grand Avenue               DANIEL J. KANE
  50th Floor                                     MUNGER, TOLLES & OLSON LLP
Los Angeles, CA 90071                  601 Massachusetts Avenue NW
Telephone: (213) 683-9100            Suite 500E
john.gildersleeve@mto.com          Washington, DC 20001
                                                   Telephone: (202) 220-1100
                                                   donald.verrilli@mto.com

*Counsel for Defendant-Petitioner The Goldman Sachs Group, Inc.*

Andrew J. Ehrlich                         Scott A. Edelman
Kristina Bunting                          MILBANK LLP
Daniel S. Sinnreich                      55 Hudson Yards
PAUL, WEISS, RIFKIND,                New York, NY 10001
WHARTON & GARRISON LLP         (212) 530-5000
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

*Counsel for Defendant-Petitioner*     *Counsel for Defendant-Petitioner*
*Lloyd C. Blankfein*                        *Gary D. Cohn*

30

## CERTIFICATE OF COMPLIANCE

1.      This petition complies with the type-volume limitation of Federal Rule of Appellate Procedure 5(c) because the body of the petition contains 5,200 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f).

2.      This petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Century Schoolbook 14-point font.

DATED:  September 18, 2025          By:   _/s/ Donald B. Verrilli, Jr._
                                          Donald B. Verrilli, Jr.

31

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2025, I caused the foregoing to be served via electronic mail on all counsel of record in the district court action. I have also submitted an original and three paper copies to the Court via overnight delivery.

DATED: September 18, 2025     By:  _/s/ Donald B. Verrilli, Jr._
                                   Donald B. Verrilli, Jr.